574 So.2d 3 (1990)
J.C. PATEL d/b/a Sonya Motor Inn
v.
TELERENT LEASING CORPORATION.
No. 07-CA-58989.
Supreme Court of Mississippi.
December 19, 1990.
Thomas J. Lowe, Jr., Jackson, for appellant.
Patrick F. McAllister, Jackson, for appellee.
Before HAWKINS, P.J., and PRATHER and BLASS, JJ.
HAWKINS, Presiding Justice, for the Court:
J.C. Patel has appealed a judgment of the circuit court of the First Judicial District of Hinds County holding him liable for all payments due under a lease agreement with Telerent Leasing Corporation of television sets and equipment for his motel. In doing so the circuit court reversed and rendered a judgment of the county court in Patel's favor. Finding that there was substantial evidence to support the finding of the county court and the judgment therein not manifestly wrong, we reverse the circuit court and reinstate the county court judgment in favor of Patel.

*4 FACTS
On April 25, 1985, Telerent Leasing Corporation, a Delaware corporation with principal offices in Raleigh, North Carolina, entered into a lease agreement with Jagdish C. Patel, doing business as "Sonya Motor Inn" in Jackson, for the lease purchase of 30 General Electric brand television sets with accessories, to be installed in the 50-room motel. The agreement also obligated Telerent to "change out existing taps in all rooms and provide one in-line amplifier," and Patel to pay 84 monthly installments of $281.16 each, beginning "on or before the first day of the month following the completion of equipment by the Lessor." Patel was given the option to purchase for $1.00 following payment of the 84 installments.
The lease agreement obligated Telerent to replace or repair television sets stolen or damaged, provided Patel promptly reported the loss to the law enforcement authorities and to Telerent. There was also typed onto the contract the following provision:
It shall be the responsibility of the Lessee to provide service to Telerent's equipment for the duration of the Lease Agreement and to keep same in proper working condition.
Four written amendments were made to the contract. Lease Addendum III dated August 3, 1985, obligated Telerent to install a theft alarm in the 50 rooms, increasing the rent $27.39 a month. Addendum IV dated September 13, 1985, obligated Telerent to provide insurance for all television receivers.
On June 20, Patel signed a completion certificate acknowledging that he had received and accepted delivery of the 30 television sets and "the installation completed to our satisfaction." On October 15, Patel signed another completion certificate on the same type Telerent form acknowledging receipt and installation of 30 pedestals and 50 taps and 50 theft alarms.
On November 11, Telerent wrote Patel a three-page letter concerning their problems. The letter recited that Patel had rejected Telerent's first billing in July because the installation was not complete, and that Telerent had gone back and extended the distribution system to all 50 rooms. The letter then recited that the theft alarm system to all 50 rooms increased the monthly lease payment by $27.39, in accordance with Addendum III. Telerent stated that because Patel had not acknowledged full completion of the installation until October 15, Telerent had agreed to make the full term lease agreement effective November 1. The letter also recited that the new monthly lease payments, including the alarm system to all 50 rooms, would be $281.16, as stated in the original lease agreement, plus 6% sales tax of $16.87, plus the theft alarm system covered by Addendum III of $27.39, plus sales tax of $1.64, making his total monthly lease payment $327.06.
This letter informed Patel that he had used the television receivers since June 22, and the company was making a concession and taking out the charges for the antenna/distribution system from the lease payment, leaving a balance due of $254.68 per month for four months, or a total of $1,018.72. The letter demanded that the company receive promptly these two amounts, totaling $1,345.78, or Telerent would repossess their equipment.
The letter also recited a problem Telerent had with some of Patel's reporting of the thefts of the television sets, and that Telerent's problems with Patel had gone on too long.
On November 17, Patel wrote a handwritten letter to Telerent enclosing a check for $272.55, which represents $327.06, the monthly payment, less $54.51, the pro-rated amount for five television sets which had been lost and not replaced. This letter asked Telerent to refer to Patel's previous letters to the company of "10-25-85, 8-18-85, 9-22-85, 7-10-85," and recited that the 28 television sets
[W]ere installed on 6-22-85, but the distribution system and taps were not installed or modified in any room. Nothing was done on distribution system and wiring except installation of new antenna only on 6-22-85. These televisions did not work because of bad distribution system until 10-15-85. Therefore this TVS *5 and distribution system installation contract was completed on 10-15-85 and not on 6-22-85. Therefore payment starts from 10-15-85 and not from 6-22-85. Nothing on antenna distribution system was done in any room until 10-15-85. I did not have any use of television receivers until 10-15-85. I could use them only from 10-15-85 when this complete work was done. Therefore I do not owe any money until Nov. 1, 1985. All warranty and guaranty should and will start from 11-1-85.
The letter informed Telerent that he, Patel, had lost five color televisions which he reported by letters of July 10, September 22, and October 20, and that the sets lost were Telerent's from rooms numbered 100, 101, 103, 157 and 159 as he had reported, and asked that they be replaced immediately.
On November 25, Telerent wrote Patel, returning his check, and demanding payment of $1,345.78. The letter further informed Patel that unless remittance was made within five days, Telerent could declare the entire amount of the lease agreement due and payable, and Telerent could remove the property.
Patel responded by another handwritten letter of December 4, reiterating his previous position, and complaining that the theft alarm was not working properly, and the amplifiers and other equipment were hanging but not properly mounted in the cabinet. He again enclosed a check for $272.55 for payment from November 1-30, 1985. He warned Telerent not to remove the equipment.
Subsequently, Telerent instituted a replevin action in the county court of the First Judicial District of Hinds County, and received a judgment giving the company possession of 22 color television sets with radio, 22 locking floor pedestals, and the theft alarm system.
Telerent sold the repossessed equipment at a public sale at which it was the only bidder, bidding $110.00 per set plus $500 for the theft alarm system, totaling $2,920. Telerent on July 7, 1986, filed a complaint against Patel in the county court of Hinds County for $24,445.44 damages. The damages were arrived at by totaling the sum due under the lease agreement of $23,617.44 plus reasonable expenses in repossessing and selling the property, including attorney's fees of $3,748.00, or $27,365.44. From this $2,920 was deducted, leaving the net damages of $24,445.44.
At a non-jury county court trial, Larry Whitley, collection manager for Telerent, and Patel were the only witnesses. Patel testified he was never told he would be billed for partial completion. He first wrote Telerent at the end of June 1985, and wrote a total of seven letters complaining of the service and requesting completion of the distribution system.
The county judge found that Patel had rejected the contract, that the contract was incomplete as to what was required to be completed. The county judge then stated:
Specifically, lessor was to change out the existing taps in all rooms and provide one in-line amplifier. The court specifically finds that this provision of the contract is typed in, was specifically required and was not complied with or met.
The judge also found that the notice requirement of the contract was not met either under North Carolina or Mississippi Law.[1]
A judgment was entered December 22, 1986, finding that the defendant had "properly and timely rejected and abandoned his contract with Plaintiff," and that plaintiff had failed to give proper notice. The judgment then denied the relief sought by the plaintiff.
Telerent appealed to the circuit court of the First Judicial District of Hinds County. On December 27, 1987, the circuit judge rendered an opinion making factual findings and conclusions of law. He concluded North Carolina law should apply, pursuant to Miss. Code Ann. § 75-1-105. He then *6 found that Patel, under the provisions of North Carolina General Statute § 25-2-606, had accepted the television sets by execution of the completion certificate on June 22, 1985, and engraving the name "Sonya Motor Inn" onto each of the leased sets. Patel also had failed to effectuate a proper rejection as set forth under N.C. Gen. Stat. § 25-2-602.
Judgment dated December 17, 1987, was rendered reversing the judgment of the county court and rendering judgment for Telerent in the amount of $24,445.44 plus lawful interest.
Patel has appealed.

LAW
Under either Mississippi or North Carolina law, the decision to apply the provisions of the Uniform Commercial Code [hereinafter UCC] to a lease/purchase agreement depends on whether the lease is the functional equivalent of a sale. Alpiser v. Eagle Pontiac-GMC-Isuzu, Inc., 97 N.C. App. 610, 389 S.E.2d 293, 294 (1990) (UCC not applied to automobile lease providing for purchase at fair market value at expiration of lease); Tolaram Fibers, Inc. v. Tandy Corp., 92 N.C. App. 713, 375 S.E.2d 673, dis. rev. denied, 324 N.C. 436, 379 S.E.2d 249 (1989); J.L. Teel Co. v. Houston United Sales, Inc., 491 So.2d 851, 855 (Miss. 1986). Also, under the provisions of Miss. Code Ann. § 75-1-105 the parties were free to contract as to which state's law was to apply. We note, however, that the applicable UCC code sections of Mississippi and North Carolina are identical. The terms of this lease, including the nominal purchase price of one dollar per television set at the expiration of the term, is evidence of a sale, sufficient to warrant application of the provisions of UCC Article 2.
No contention was made by Telerent at any time that the replevin judgment against Patel was either res judicata or operated to collaterally estop him that it was he, and not Telerent who had breached the lease agreement.
The county court was the fact finder, and the circuit court, as well as this Court, are bound by the judgment of the county court if supported by substantial evidence and not manifestly wrong. W.H. Hopper & Associates, Inc. v. DeSoto County, 475 So.2d 1149, 1152 (Miss. 1985); Dungan v. Dick Moore, Inc., 463 So.2d 1094, 1100 (Miss. 1985); Ellis v. S. Pellegrini, Inc., 163 Miss. 385, 391, 141 So. 273 (1932). Insofar as its findings of fact and conclusions of law are concerned, the judgment of a circuit or county court in a non-jury trial is entitled to the same deference on appeal as a chancery court decree. Rives v. Peterson, 493 So.2d 316, 317 (Miss. 1986). That is, it will be assumed the trial judge made all necessary findings of fact in favor of appellee, whether stated or not. Brown v. Williams, 504 So.2d 1188, 1191 (Miss. 1987); Rives v. Peterson, supra; Bryant v. Cameron, 473 So.2d 174, 179 (Miss. 1985); Dungan v. Dick Moore, Inc., supra; Cotton v. McConnell, 435 So.2d 683 (Miss. 1983). Moreover, if the judgment of such court can be sustained for any reason, it must be affirmed, and even though the trial judge based it upon the wrong legal reason. Shewbrooks v. A.C. and S., Inc., 529 So.2d 557 (Miss. 1988); Allgood v. Bradford, 473 So.2d 402 (Miss. 1985); Briggs v. Benjamin, 467 So.2d 932 (Miss. 1985); Tedford v. Dempsey, 437 So.2d 410 (Miss. 1983); Taylor v. F. & C. Contracting Co., Inc., 362 So.2d 625 (Miss. 1978); Texas Gas Transmission Corp. v. City of Greenville, 242 So.2d 686 (Miss. 1970); Lee v. Memphis Publ. Co., 195 Miss. 264, 14 So.2d 351, 152 A.L.R. 1428 (1943).
There was ample evidence for the county court to find that the system installed by Telerent was incomplete and was not working satisfactorily prior to October 15, 1985, and that Patel had a valid complaint. The letters from Patel, and the concession Telerent made by its letter of November 11, 1985, support such a conclusion. Neither the circuit court nor this court can ignore this substantive evidence.
Telerent's failure to properly install the equipment was a material breach of contract, the remedy for which gave Patel the right to withhold payment and is provided by:

*7 Miss. Code Ann. §§ 75-2-717, N.C. § 25-2-717
The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due under the same contract.
Official comment 1 to UCC § 2-717 provides:
This section permits the buyer to deduct from the price damages resulting from any breach by the seller and does not limit the relief to cases of breach of warranty as did the prior uniform statutory provision. To bring this provision into application the breach involved must be of the same contract under which the price in question is claimed to have been earned.
Official comment 2 to UCC § 2-717 provides:
The buyer, however, must give notice of his intention to withhold all or part of the price if he wishes to avoid a default within the meaning of the section on insecurity and right to assurances. In conformity with the general policies of this Article, no formality of notice is required and any language which reasonably indicates the buyer's reason for holding up his payment is sufficient.
The cross reference following official comment 2 to UCC § 2-717 refers to UCC § 2-609, which provides in part:
(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.
As to "cross-reference" in the UCC, 1 Anderson, Anderson's Uniform Commercial Code, at v (1961) states:
The Commentary contains particularly full cross-references to other parts of the work. Thus, moving from one related subject to another is made simple and the risk of overlooking a significant provision or commentary is avoided.
As to the applicability of UCC § 2-609 to circumstances analogous to this case, 2 Anderson, Anderson on the Uniform Commercial Code, § 2-609:5 at 258 (2nd ed. 1971) states:
Although the "demand for assurance" provision of the Code is by definition applicable only to contracts for the sale of goods, the section has been extended to leasing transactions. Thus it has been held that where the supplier of films under a rental service contract was supplying nonconforming films, the lessee, in addition to exercising its contract right to return the unsatisfactory items, could demand assurance from the lessor of proper performance. [Footnotes omitted]

Patel requested further assurances that Telerent would fully perform the unfulfilled conditions remaining under the contract under UCC 2-609 for which he should not be penalized. R. Hillman, J. McDonnell, & S. Nickles, Common Law and Equity Under the Uniform Commercial Code, § 8-25 (1985).
Also the principle of law codified by the § 2-717 offset provision is consistent with pre-UCC contract law. Pre-UCC laws supplement code provisions and are still applicable unless displaced by particular provisions of the code. Miss. Code Ann. § 75-1-103 (1972); United States v. Crittenden, 563 F.2d 678 (5th Cir.1977). See also, Gulf South Capital Corp. v. Brown, 183 So.2d 802, 804-805 (Miss. 1966) ("breach of contract may be material without repudiation, and if so, should excuse other party from performance"); Hensley v. E.R. Carpenter Co., Inc., 633 F.2d 1106 (5th Cir.1980) (applying Mississippi law); Restatement Second § 237 ("material" failure of performance justifies suspension).
In Missouri Bag Co. v. Chemical Delinting Co., 214 Miss. 13, 58 So.2d 71, 33 A.L.R.2d 501 (1952), the buyer/defendant refused to pay for shipment of bags after acceptance and use thereof and sought recoupment *8 and an offset due to alleged defects in bags. The court noted that the buyer could accept the defective goods, use them after discovery of the defect, and yet use a setoff against the purchase price for the defects. The Court quoted 46 Am.Jur. p. 442, Sales, § 258 as follows:
By weight of authority, even where the buyer of goods by executory contract has sufficient opportunity to inspect the goods, or he does inspect the same and ascertains defects therein, rendering them unmerchantable, he may, nevertheless, accept the goods and rely upon a breach of the implied promise or warranty of merchantability as an offset to or counterclaim against the amount due for the purchase price. Acceptance of goods with knowledge of defects making goods unmerchantable is not as a matter of law an acceptance in full satisfaction or waiver of the seller's promise or warranty that the goods are merchantable.
214 Miss. at 28, 58 So.2d at 76, 33 A.L.R.2d at 508.
In the case of Shreve Land Co., Inc. v. J & D Financial Corp., 421 So.2d 722 (Fla. App. 1982), the court utilized a setoff provision analogous to UCC § 2-717 to allow the buyer to deduct all or any part of its damages for the seller's breach from the price of 55 doors accepted of the 103 doors contracted for and delivered late due to seller's fault. Id. at 724; Fla. Stat. § 672.717 (1979). This is the general law. 67 Am.Jur.2d, Sales § 1270.
There being substantial evidence to support the county court judgment, which is not manifestly wrong, the judgment of the circuit court is accordingly reversed and the judgment of the county court reinstated.
REVERSED AND JUDGMENT OF THE COUNTY COURT REINSTATED.
ROY NOBLE LEE, C.J., DAN M. LEE, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.
NOTES
[1] The contract recited that the parties would be governed in interpretation and construction of the contract.